## ARMSTRONG RUBBER CO. Inc., v. GRIFFITH.

### No. 345.

Circuit Court of Appeals, Second Circuit.

July 14, 1930.

Frederick Malcolm Wolf, of New York City, for appellant.

Milton Elias Schattman, of New York City, for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This was an action to recover $12,999.68 for goods sold and delivered, consisting of automobile tires to the number of about 1,400, upon which there was a credit of $4,114.10 representing payments on account of the purchase price and adjustments made because of 208 returned tires. The balance due plaintiff after applying the foregoing credit amounted to $8,885.58, and was conceded by the defendant to be correct. The defendant rested his case upon a counterclaim wherein he sought to recover (1) general damages for breach of warranty arising from defects in tires other than the 208 above mentioned; (2) special damages arising from injury to defendant's business and reputation because of defective tires; (3) damages because of an alleged conversion of molds which defendant furnished to plaintiff for the manufacture of the tires.

The defendant sold tires to bus companies, automobile agencies, service stations, and ultimate consumers. The molds had the name "Griffith" stamped on them so that the tires were associated with the defendant, though the evidence indicates that the customers of the latter knew that he had no factory and was a jobber whose tires were manufactured for him by some one else.

The defendant guaranteed a large mileage to some of his customers who purchased the plaintiff's tires from him and the plaintiff made no such guaranties. But the defendant, in arranging to purchase the tires, said that it was agreed that he should have "the best the market affords without regard to price."

The defendant returned 176 tires, other than the 208 upon which adjustments were made, claiming that they were defective. Plaintiff's factory superintendent testified that these tires showed defects which made them worth $1,577.98 less than the contract price. The jury adopted this testimony and allowed $1,577.98 on these 176 tires. Upon

about 200. other tires which defendant retained and claimed to be defective the jury made an allowance for defects of $250. The defendant testified that plaintiff's sales manager told him that their "Famous Coach" tire showed a wonderful mileage and that he arranged to buy upon an assurance of "quality and uninterrupted service for bus and truck trade." The sale seems to have been by description, which included an implied warranty that the goods should be of merchantable quality. New York Personal Property Law (Consol. Laws N. Y., c. 41) § 96(2).

The plaintiff began an action in the superior court of Connecticut, in August, 1928, to recover the balance of $8,885.58 involved in the case at bar. An attachment was levied on the molds in its possession, and service upon the defendant was obtained by publication. Judgment was recovered by default and without defendant's appearance. The molds were sold on execution for $600, which was paid over to the plaintiff.

Upon the verdict allowing the defendant $1,577.98 and $250 on his counterclaim for defective tires, and the further sum of $600 collected in the Connecticut action, the plaintiff entered a judgment in the court below for $7,014.85, which was based upon the conceded balance of $8,885.58, with interest and costs, less the foregoing allowances for defective tires and the $600 realized on the sale of the molds.

The trial judge charged the jury that it was their duty to find the difference between the value of the tires, had they been as warranted, and the value in the condition in which they were delivered. He excluded from their consideration testimony that, after numbers of tires were found to be defective, defendant lost customers, and his net earnings dropped from $25,000 to $10,000 per year. It was the exclusion of this evidence that the defendant says was the chief error of the trial court.

Section 150(7) of the Personal Property Law (Consol. Laws N. Y., c. 41) of the State of New York provides that: "In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty."

The question is whether there were any "special circumstances" in the present case which entitled the defendant to recover damages for loss of his good will. Knowledge

that the goods are to be resold and, if defective, will be the occasion of a loss of profits is not enough to justify an award of special damages. The circumstances under which special damages may be allowed are discussed in Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 23 S. Ct. 754, 47 L. Ed. 1171. There it is said (at page 543 of 190 U. S., 23 S. Ct. 754, 755, 47 L. Ed. 1171):

"When a man makes a contract, he incurs, by force of the law, a liability to damages, unless a certain promised event comes to pass. But, unlike the case of torts, as the contract is by mutual consent, the parties themselves, expressly or by implication, fix the rule by which the damages are to be measured. The old law seems to have regarded it as technically in the election of the promisor to perform or to pay damages. Bromage v. Genning, 1 Rolle, 368; Hulbert v. Hart, 1 Vern. 133. It is true that, as people when contracting contemplate performance, not breach, they commonly say little or nothing as to what shall happen in the latter event, and the common rules have been worked out by common sense, which has established what the parties probably would have said if they had spoken about the matter. But a man never can be absolutely certain of performing any contract when the time of performance arrives, and, in many cases, he obviously is taking the risk of an event which is wholly, or to an appreciable extent, beyond his control. The extent of liability in such cases is likely to be within his contemplation, and, whether it is or not, should be worked out on terms which it fairly may be presumed he would have assented to if they had been presented to his mind. For instance, in the present case, the defendant's mill and all its oil might have been burned before the time came for delivery. Such a misfortune would not have been an excuse, although probably it would have prevented performance of the contract. If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach. * * * *"

The test is what liability the plaintiff "fairly may be supposed to have assumed consciously, or to have warranted" the defendant "reasonably to suppose that it assumed, when the contract was made." Globe Refining Co. v. Landa Cotton Oil Co., supra, at page 544 of 190 U. S., 23 S. Ct. 754, 755, 47 L. Ed. 1171.

In the present case there was no showing as there was in Moran v. Standard Oil Co., 211 N. Y. 187, 105 N. E. 217, that the plaintiff agreed to make good "losses due to * * * defective goods, whether resulting in the con-

cession of allowances to customers or in diverted trade. \* \* \*" Page 191 of 211 N. Y., 105 N. E. 217, 218. We can hardly doubt that such an uncertain and perilous risk as indemnification against loss through alienation of customers was never contemplated by the plaintiff in this case. Nothing was said about it in the negotiations between the parties, and it seems quite unlikely that it ever should have been intended. In Moran v. Standard Oil Co., supra, at page 195 of 211 N. Y., 105 N. E. 217, 220, Cardozo, J., remarked that: "When defective goods are sold, the measure of damages does not include the profits lost from the vendee's failure to resell them, unless such a loss is proved to have been within the contemplation of the parties. \* \* \* Still less does it include the loss of profits resulting from the alienation of the customers."

See, also, British Columbia, etc., Saw-Mill Co. v. Nettleship, L. R. 3 C. P. at page 508; Horne v. Midland Ry. Co., L. R. 7 C. P. at page 591; Elbinger Actien-Gesellschafft v. Armstrong, L. R. 9 Q. B. at page 478; Setton v. Eberle-Albrecht Flour Co. (C. C. A.) 258 F. 905; Balph v. Rathburn Co. (C. C. A.) 75 F. 971.

Swain v. Schieffelin, 134 N. Y. 471, 31 N. E. 1025, 18 L. R. A. 385, where damages from loss of good will were allowed, was decided by an almost evenly divided court, and can hardly be regarded as law in New York after the language in Moran v. Standard Oil Co., supra. If the plaintiff here can recover for loss of good will, it is difficult to see what limits are to be set to the recovery of such damages in any case where defective goods are sold and the vendee loses customers. Indeed, if such were the holding, damages which the parties never contemplated would seem to be involved in every contract of sale. To award such damages would be particularly unfair in this case where the defendant claimed that the 176 tires had a value of $15,000, and the loss on them was found by the jury to be only $1,577.98, while defendant asserted that there was an almost total loss. To put it another way, all the tires for the defects of which defendant sought recovery he valued at $19,898.43. The jury allowed him but $1,577.98, plus $250, a total of $1,827.98, or a sum less than 9 per cent. of the total value of the tires. It thus appears that there was no extraordinary percentage of defects, though there was a greater percentage than usual in sales of this kind. If the plaintiff had failed to perform its contract, there could have been no consequential

damages for loss of good will though the loss might have occurred. As Justice Holmes said in Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. at page 544, 23 S. Ct. 754, 755, 47 L. Ed. 1171: "If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach."

The defendant chiefly relies on the decision of the Circuit Court of Appeals of the First Circuit in Barrett v. Panther Rubber Mfg. Co., 24 F.(2d) 329. There the defendant sold a certain oil as an ingredient for softening scrap rubber in order to produce rubber shoddy for heels. This oil was to be substituted for another oil formerly employed by the plaintiff and was represented by the defendant to be better adapted to the proposed use. The defendant urged the plaintiff to make the purchase because of the peculiar advantages of its oil. Loss of good will due to the defective oil was allowed as an element of damage. Under section 96 of the New York Personal Property Law there is an implied warranty of fitness for a particular purpose where the buyer makes known to the seller the particular purpose for which the goods are required and it appears that the buyer relies on the seller's skill or judgment. In Barrett v. Panther Rubber Mfg. Co., supra, a similar section of the Massachusetts Uniform Sales Act was held to cover the situation and to authorize an allowance of damage to good will. In the case at bar the defendant only relied on the plaintiff's skill in the sense that any one who buys an article relies on the skill and judgment of the seller. The tires here were to be used for the general trade and were not, in our opinion, to be used for a particular purpose, as was the oil in the Barrett Case. But, irrespective of that decision, both section 150 of the New York Personal Property Law and the decisions of Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 23 S. Ct. 754, 47 L. Ed. 1171, and Moran v. Standard Oil Co., 211 N. Y. 187, 105 N. E. 217, as well as what we regard as the most sound dictates of public policy, would seem to preclude a recovery here for loss of good will.

The only other item that is involved in defendant's cause of action is his claim for damages arising out of the alleged conversion by plaintiff of the molds. A demand by defendant's truckman for the molds on July 25, 1928, and a refusal to deliver them, are said to have worked a conversion, but there is no proper proof that the truckman went to get the molds. The only attempt to prove this transaction was by defendant's own declara-

tion in the letter of August 4, 1928 (Exhibit 11), which was hearsay evidence. There was also a telephone conversation in July, 1928, between defendant and Machlin, plaintiff's sales manager. Defendant quoted Machlin as saying: "You cannot have your molds until you pay your July bill." But the conversations in July about the molds seem to have occurred while the parties were still negotiating for an adjustment and for a liquidation of defendant's indebtedness. The letter of August 4 (Exhibit 11) was the first formal demand for the molds, and contained the statement:

" * * * If we have not had from you by Friday, August 10th, a disposition of this matter entirely satisfactory to us * * * we will proceed promptly then to have new molds made for our use * * * and * * * we in any event hold you responsible for any expense or other loss we may sustain by reason of your failure to deliver these molds up promptly upon our demand therefor and will charge the same to you."

This, we think, gave the plaintiff a locus pœnitentiæ and in effect extended plaintiff's time to deliver the molds to August 10. When the molds were attached in the Connecticut action, there had been no conversion, and they were still the property of the defendant, which could be seized and applied upon his indebtedness. Therefore the counterclaim based upon the conversion of the molds must fail.

We discover no material error in the record, and the judgment is affirmed.